My name is Victoria Iger. I represent the Petitioner Appellant Jonathan Duty. I'd like to reserve three minutes for rebuttal. This case involves an extended nighttime custodial interrogation of an inexperienced, timid, and deference juvenile outside the presence of a parent or any other supportive adult. We are presenting two issues to this Court. We contend that the Miranda warnings that he was given were inadequate, and with respect to the right to counsel, we contend they were wrong. We also contend that regardless of the adequacy of the Miranda warnings, this was an involuntary confession. And, of course, we raise a third issue, and that is that we contend that under current AEDPA standards, Jonathan Duty is entitled to habeas corpus relief. Jonathan Duty was a 17-year-old juvenile, and he was interrogated for nearly 13 hours straight about the killing of nine persons at a Buddhist temple near Phoenix, Arizona that occurred in August of 1991. At the time of his interrogation, four men from Tucson had been interrogated by the same task force, and those men, all adults, had themselves confessed to the crimes, and they were charged with the crimes. There was little or no physical evidence linking them to the crimes until, and then there was a break in the case, and the murder rifle was identified as a rifle belonging to a young man named Raleigh Carataccia, who had some connections to Jonathan Duty. So Jonathan Duty was brought in, and the task force was, they knew what they were trying to do. They were trying to get from Jonathan Duty information linking him, the rifle, and the Tucson Four, and they did it. And they interrogated him for 13 hours straight, and they got what they wanted. They got him to implicate the Tucson Four, implicated himself, implicated some others, and the interrogation ended. Well, the state of Arizona ultimately decided that the Tucson Four had nothing to do with these crimes, notwithstanding their confessions to them, and it was Jonathan Duty who was charged with these murders. And the 13-hour interrogation was a key part of the state's case against him. On the Miranda issue, there is no rule more firmly established than the rule of Miranda v. Arizona, and it requires that all individuals, not just juveniles, be advised in clear language of the rights they are being asked to waive when they are interrogated by the police. And the warnings are simple ones, and the Supreme Court has said there's no, there's no magic or special wording, but Miranda warnings or their equivalent must be administered. Now, do you think that initially they administered what would be an adequate Miranda warning? No. And they only So tell us exactly what was wrong with the initial Well, they only administered what they called the warnings once. So there's only one set of warnings that you have to be concerned about. And they are in the beginning of the interrogation tapes, and they are in the transcripts of the interrogation, and it took them 15 full minutes to warn Duty of his rights. And I put warn in quotation marks because every time they got to something that might make this young man, this boy, sit up and take notice, they buried it in a blizzard of words designed to suggest that this wasn't too important and not to take it out of context and don't make too much of it. They misrepresented the purpose of the warnings. They told him it's, quote, to save you some time, to get you back to what you need to do, to get things squared away, not meant to scare you, don't take it out of context. They said that twice. Quote, it's a little more, a little less technical and a little less heavy. So, counsel, what clearly established of Federal law are you relying upon to say that the Miranda warnings were inadequate? I'm relying upon Miranda itself, and there are two other cases. I think they are Prysock and Egan, perhaps. They're both in my brief. And if you look at them, you will see that the warnings that they – that the Supreme Court said were Miranda warnings or their equivalent were essentially the Miranda warnings. Boom, boom, boom, boom. But the Supreme Court is also clear there's no magic word. So what language in any of those cases support your argument that because there was some deviation from the traditional Miranda warning that that constitutes a – that equates to a constitutional violation? Well, I can't at this moment pull you specific wording from any of those three cases, but I believe in all of those three cases, the Supreme Court is crystal clear that the – that the warnings administered have to be clear and that they have to communicate to the individual being warned what the warnings are and what the rights are he's being asked to waive and to bury them in a blizzard of patter, especially to a juvenile, a juvenile who said he never had heard of the Miranda rights. I think it's a cynical exercise in obfuscation and misdirection, and I think Miranda itself says that's no good. Is there any indication in that warning that he was to need to invoke his rights only if he were guilty? Well, I think there is a – and I'm not sure I'm answering your question, but when they got around to, quote, advising him of his right to counsel, this is what they said. I mean, the form was very clear. It says something like, you have a right to counsel, and counsel or a lawyer is somebody who will help you with regard to the crime we think you have committed. But that's not what they said. They said – and if you'll give me a moment – quote, an attorney is a lawyer who will speak for you and help you concerning the crime or any kind of offense. We might think that you or somebody else is involved in it, okay. If you were involved, then that's that – then that's what that would apply to. And I think that's misadvice about the right to counsel, because this young man, this boy, was entitled to counsel whether he was involved in the crime or not, because this was a custodial interrogation. Counsel, the district court found that the officers read each warning from the standard juvenile form and provided additional explanations as appropriate. Do you take issue with that finding? I do take issue with that finding, and I think it's a – it's a finding that is not supported by the factual record. Clearly erroneous. It was clearly erroneous, and it was not supported. They used a juvenile Miranda form in this process, and they got Jonathan to initial it, but they didn't – even though they told him they were reading it verbatim, they clearly were not. And you can see that. I mean, there can't be any dispute about that if you just compare the Miranda form, which is in the excerpts of record, with the transcript of the interrogation hearing. There was no verbatim reading of the form. So, yeah, they used it, but they did not read to him the rights on those forms, and they certainly did not read him the part of the form that says you have the right to stop answering our questions at any time, because throughout the night they kept telling him, you're going to stay here, we're going to continue, this is going to continue until you – until you tell us what happened. Is that a kind of a form of demirandizing by saying you can't leave until you answer the question? Well, I think it is, and we have made that argument. But why does the Supreme Court authority support the demirandizing argument? I can't quote you or cite you a Supreme Court decision on demirandizing, except that I can – I would like to argue, and I do argue that that makes clear, when the officers told him throughout the interrogation that he had to continue answering their questions, it made clear that what they told him before, or what they sort of told him before, what they pretended to tell him before, was not that you have a right to remain silent. They didn't – Well, the form actually says that you also have the right to stop answering at any time until you talk to a lawyer. Yes, and there is – And that's not exactly what Miranda says, because I went and looked at it. In other words, the question is whether he had to invoke his right to be quiet or whether he could just be quiet, because he certainly was quiet a good deal of the time. And this form seems to say that he had the right to do that. And then he was told that he didn't, because they kept saying, but you have to answer me, you have to answer me. So my sort of complicated question is, they probably violated this form, but did they violate Miranda? Well, I looked at that question, Your Honor, too, and I think that the Supreme Court has said that the Miranda rights are for rights, and the suspect does not have to be advised that he can stop questioning at any time. But my point is that they didn't adequately tell him that he had the right to remain silent, and they certainly didn't mean it and they didn't communicate it, because they probably didn't even believe it. They certainly didn't want to accept it as the rule of law in this case, because throughout the interrogation they told him that that was not his right. And I would like – because you've mentioned the form that was used, I would like to comment on any suggestion in the State court, by the State courts, that Jonathan Doody read the form before he signed it. Jonathan Doody, I think in my brief I overstated his reading skills by suggesting he reads at a fourth-grade level. In fact, I went back, and there is a psychologist's report that was prepared for purposes of the juvenile transfer hearing, for the trial court. And it's part of the record in this case, and it's something that the State has relied upon not only in the State court, in connection with the suppression motions, but they put it in the record of the Federal proceedings here. And it's an Exhibit E to Document 28, and it's a psychologist's report, a Dr. Martig, who evaluated Jonathan Doody just a month after this interrogation took place, and which comments on his educational level and at some length about his reading skills or lack of reading skills. This was a kid who was born in Thailand, lived in Thailand until he was five. His father dropped dead in front of him. His mother left for Thailand, leaving him behind with relatives. I think he started out in rural Thailand. His mother left. He went to some relatives in Bangkok. His mother went to Germany, where her sister or sisters were and had married American GIs. She did the same thing. She has no contact with Jonathan for three years. He's eight years old. She comes back to Thailand with her new husband, takes Jonathan to Germany, where this newly reconstituted military family then starts to move around the world. And the psychologist's report, I think, paints a very clear picture of a young man who really had trouble with his transition from Thai culture to American culture, and comments specifically on his lack of verbal skills and his reading difficulties. And I think it's a very important piece of information that was before this. What reading did the psychologist say that Mr. Doody performed? Well, apparently there were some tests given, and it suggests that his reading recognition grade equivalent was 2.9, and I take that to mean that he read like a second grader or somebody at the end of second grader in that particular test. His reading comprehension grade equivalent was 4.1, a little higher, but the total reading grade equivalent was 3.4. So that's a third grade level. And in any event, there's no indication in this record that Jonathan actually read the form or attempted to read the form, because the officers lied to him and told him that they were reading it to him. What about the evidence in the record that he was doing well in school? Well, the psychologist's report that I just referred to speaks to that issue as well. Jonathan was asked how he was doing at school in the beginning of the interrogation, and I think he answered something like he didn't know, because the year, the school year was just starting. It was October. So the officer said, well, how'd you do last year? And his answer was B.A. average, whatever that means. I don't know what that means. B.A. average? B.A. average. Well, actually, on the tape, it sounded like he really said B.A. average. I think it was a mistranscription. Okay. So he said B.A. average. But the psychologist's report indicates that he was repeating algebra, which he had failed the previous year. So I don't see how he could even have had a B.A. average. But he was not ‑‑ it's clear that he, if he was in 11th grade, it was because he was 17 years old. He had lived all over the world. His English language skills were not great. There's some indication that because of the time, the age he was when he left Thailand, and I think there's an indication in the ‑‑ Are you going to address the voluntary indecision? Well, in part, I have been addressing the voluntariness issue, because the voluntariness issue is it depends upon the totality of the circumstances. How does ‑‑ does it feed into that? I mean, the ‑‑ the objective circumstances, one would say, are sort of, you know, marginal compared to other cases. I mean, he was ‑‑ it was a very long interrogation. He was young. But they did ‑‑ they did offer him food, and it was the middle of the night. And he probably weren't any promises made. So how do you then figure into that analysis the same things we've been talking about, these statements that say you have to answer us, and we're not going anywhere until you answer us, and that sort of thing? Well, one answer is the state courts looked at some of these factors. I think the totality of the circumstances test says you look at the big picture. I mean, the test is you look at the facts of the interrogation and whether they overbore the will of this particular individual. So all of these things that we have talked about are pertinent factors which must be considered. And I think that all of the factors, it's not just a matter of ticking them off. I don't think that's an appropriate ‑‑ It's a strange standard, because of course it overbores will, because he began by saying I don't ‑‑ by not answering, and eventually he answered. To that degree, his will was overbore, but that's always going to be true of somebody who begins by not confessing and eventually confesses. So I don't know what it means. Well, it may always be true, but I'd like to say again that there's a special factor in this case, and that in this case, they got him to implicate the Tucson Four. I mean, I think the state, and they've never taken a position on this, and they just completely ignore that, but I think the state would have to concede that to the extent that he implicated the Tucson Four, that it was coerced and involuntary. And as to some of the other factors you mentioned, he was offered food, but he didn't get any food, so he was food deprived. He was sleep deprived. There were promises made. He was told that his words would not leave the room. Meanwhile, they're secretly taping it, and they are leaving the room, and they're being taken to Garcia, who is also being interrogated, and the interrogation was very, very long, and it wasn't just a pleading kind of interrogation, although there was many hours of that. There was also a lot of yelling involved, because you can hear it in Garcia's being interrogated in the next room, or at least in the same headquarters, and you can hear Judy's interrogation on Garcia's tape, and Garcia's saying, I don't want to hear this. So it wasn't just a calm pleading. They used every trick in the book, relays of officers, all night long, he's sitting in a chair, they sent his stepfather away. He never said he didn't want a parent present. He said it doesn't matter. So at the very most, he was neutral on the question. He didn't say, and the State says it over and over again, he didn't want his stepfather present, and so we don't have to consider that there was no parent present. But the same time the task force was bringing this kid in, they were delivering to his stepfather on the other side of town some cash reimbursement so that he would leave and go back to Colorado and would not be. Kagan. Their explanation for that is that was a prior arrangement. Well, there's no State court finding on that. You have the Heath interview, which is part of the suppression hearing, and there were the judge at the suppression hearing would not permit any evidence to be introduced at the hearing. And Heath could not testify, but it's crystal clear, I think, to anybody who looks at the evidence that's in the record that this was an extraordinary arrangement that was made to get this stepfather out of town. And I see I only have less than three minutes left, and I would like to reserve time for rebuttal. Thank you very much for your argument. Thank you. May it please the court. My name is Joe Maziarz. I'm an assistant Arizona attorney general representing respondents in this matter. The two issues before this court are simple and straightforward. Was the Arizona Court of Appeals determination that Duty was advised of and waived his Miranda right, and it's finding that his subsequent statements were voluntary, unreasonable applications of clearly established Supreme Court precedent? And the only reasonable answer to that question is no. Now, regarding the Miranda issue, Duty makes three interrelated arguments, the first being that he wasn't adequately advised of his Miranda rights because of the It certainly wasn't advised in an unusual way, because it does seem to me that the record does demonstrate that the form was not read to him. Do you disagree with that? Not entirely partially, if I could explain. The form, and this is excerpt of record item 91, the four Miranda rights are numbered one through four, and they're in bold print. Those Miranda rights were read verbatim. Wasn't the part in bold? Yes. They were read verbatim. Now, the form has a parenthetical after that telling the officer essentially to explain in lay terms what those meanings mean, because, of course, we're dealing with a juvenile. Now, the parentheticals were almost entirely read verbatim. There were some variations. Let me explain those variations. On right number three, you have the right to have an attorney present prior to and during questioning. In there it says an attorney is a lawyer who will speak for you and help you concerning the crime which we think you have done. The problem was they did not think Duty had done any crime. He was simply an investigative lead, because Caraccia had told the officers that they knew his rifle had been the murder weapon, and he said, well, I loaned it to Garcia and Duty about the time of the shooting. So as counsel notes, they had the Tucson Four in custody, and they were formally charged with the murders. At that point, they're simply investigating, one, is Caraccia telling us the truth, or is he trying to send us off on a wild goose chase, and two, how did the gun get from Caraccia to the Tucson Four? So Duty at this point is merely an investigative lead. So in reading, they read right three to him, and in explaining that to him, they made it clear to him that we're not saying we think you did anything, but you have the right to counsel. And also in the ---- And they're doing it in a way that he won't exercise them. That's their purpose. No, I disagree. I agree that they're hoping he won't exercise his rights. And they're doing everything they possibly can so that he won't exercise them. No, I disagree with that, Your Honor. They're not. They're trying to explain in lay terms the Miranda rights. And bear in mind, when they read the rights at the beginning of the interview, Duty has been very cooperative with the police. They had interviewed him a month and a half ago. His brother had been a novice monk. He's very forthcoming. He's a very bright, engaging young man. He's the commander of the ROTC Color Guard and Honor Guard. He's helping the police. They do not expect that he is going to ---- that he's involved in the crime at all. So they're, as a prophylactic measure, they simply begin the interview by advising him of his rights. So I don't believe at that point they're trying to dissuade him. They're simply complying with their obligation to attempt to explain in lay terms the Miranda rights. They didn't really have to do that. The problem with your representation is that they quickly hone in on this question of whether he borrowed the gun. About an hour, hour and a half into the interview, yes. And they seem to know, or they say they know, that he did borrow the gun. So the notion that they really weren't honing in on him seems a little fatuous. Well, he's somewhat evasive about whether they borrowed the gun. I understand that. But why would they ask? They already knew that he had borrowed the gun. They knew that Caraccia had said that he and Garcia had borrowed the gun. Now, whether that was true or not, they weren't sure. But, of course, they have to run that allegation to ground. And by doing that, they keep questioning him on it. Eventually, he denies it. And then he says, well, I borrowed it, but it was in June, two months before the murders. And then it takes another hour and a half before we get around to where he finally says, okay, I had it about that time, but still had nothing to do with it. Did he ever actually say that he borrowed the gun shortly before the murders? You know, that's a good question. He certainly said that he had borrowed the gun. Now, he initially claimed it was in June and these murders were in early August. And he eventually said he was there. But did he ever say that he had the gun? No, Your Honor, I do not think he ever said he had it during the relevant time frame. They kept probing on that, but I don't think he ever actually said he had it. So to that degree, the California – I mean, the Arizona Supreme Court opinion is wrong. There are some facts on which the Arizona Supreme Court opinion is wrong, and that's one of them. No, I disagree. They said that he, about an hour and a half, two hours into the interview, admits that he borrowed the gun. They don't say when it is. At what point did Mr. Duda become a suspect? I believe he became a suspect six and a half hours into the interview when he's asked, were you there, and he says yes. So is it common practice for Arizona police to question a witness who's not a suspect for six hours? If need be, yes. I mean, I suppose it would depend on the circumstances of the case. And is it common for Arizona police to give non-suspect witnesses the surrender warning? I don't know if it's commonplace. I do know the FBI were members of this task force, and perhaps it's FBI policy that when you ever – I believe it is – whenever you interview someone that even remotely may be a suspect, you Mirandize them. And I think they did it as a prophylactic measure. Was he remotely a suspect in this case? Possibly. Obviously, someone saying that he at one point had the murder weapon, he certainly – the police said he wasn't a suspect at that point, but obviously it's an investigative lead, and who knows where it's going to go. And I think one of the officers said, we didn't know where this was going. All we knew is we had the suspects whom we believed to be the killers in custody. We're trying to figure out how the gun got from Karakachia to the Tucson Fort. Well, they eventually told him that they knew he was there. No, I believe they asked him, were you there, and he says yes. No, no, they told him they knew he was there at some point. They may have. They may have at some point. I'm not sure if it was before or after he initially made that statement, but it was certainly right around there. Or after which, I'm sorry? Six and a half hours in when they asked him. No, it was before. It was before. It may have been somewhat before, but the reason they started thinking, well, when he's resistant to admitting that he even had borrowed the gun, this is where the police start thinking, well, he has to know something about the murders. Why would he not admit such an innocuous fact? It took him an hour and a half or so. He actually explained why, which was that he understood they were stolen. Excuse me, Your Honor? He explained why, which is that his understanding was that those guns were stolen, and that's why he didn't want to sit and admit that he had them. Okay. But the police obviously didn't have to necessarily believe that he said that. They just followed up. But getting back to the second prong of the Miranda claim, Duty claims that, or the third prong, that he was somehow demirandized during the course of the interview. Well, Davis v. United States is right on point, and once the defendant is advised of and waives his rights, the police are free to continue in questioning unless and until the person ---- Well, Davis has to do with a claim for a lawyer, right, which obviously you have to assert. Yes. But he was told, or he wasn't told, but it was on the piece of paper, but he was told, too, that he could stop answering. And he did stop answering. And why doesn't one assert the right to not answer by not answering, which he did for a very long time? And I don't have the exact wording before me. I'm sure it's in the excerpts of the record. I believe they told him he didn't ---- he could stop ---- he didn't have to continue answering questions if he didn't want to, but he has to tell them, I don't want to answer questions. That's Davis v. United States. Davis v. United States has to be an unambiguous ---- That was the lawyer. I mean, obviously you can't ask for a lawyer without asking for a lawyer. But you can assert your right to remain silent by remaining silent, and he did this for a half hour at a time. No, I believe Davis covers also indication of all Miranda rights, including the right to remain silent. How many times did they ask him the same question? Which question was that, Your Honor? Well, there were several questions, but at one point they asked the same question I think maybe 20 times. Well, I'm sure they wanted an answer to the question. And, again, unless he ---- And they also said to him, we're not going to terminate this until you answer. That was in the context, if you will, Your Honor, that was in the context of where he's claiming, and this is from the written transcript of tape 9, page 3 of 23. It's the ---- It's not in the excerpts of record, but it's exhibit M to the district court exhibits. And in the context of a long paragraph where he's claiming that he's afraid, actually he fears for his girlfriend's life, the Detective Sensenbos says, I'm concerned about you, and I'm going to stay here until I get an answer. Why are you so scared to tell? Let me help you on this, John. Why are you scared to tell us? And that's after he's claiming he fears for the life of his girlfriend. So that is in the middle of a paragraph. It's one little snippet, and it's taken totally out of context. At that point ---- It's not really out of context, because they repeated many other times, you have to answer us. I don't think they said you have to answer us. There was another point where we're going to sit here, we're going to sit there and have you go through this, saying you're not telling the truth. Well, that's the two excerpts that are cited by duty in claiming that they told him they weren't going to leave. And that's the closest you come in the course of a nearly 13-hour interview. They never told him you had to continue answering questions. It's pretty apparent, I mean, if it's 13 hours, they're never going to be there for him. They were bound and determined to get him to talk. 13 hours is an extremely long interrogation process, especially for a juvenile. It is long. I'll grant you that. And the court of appeals very carefully considered the length of the interrogation in its determination. In fact, as the magistrate noted, the court of appeals spent eight pages of its ---- I mean, for example, on tape three, he says at one point, it's important for you to tell us. I mean, you have to tell us. You have to. And there are a number of times in which they say that. You have to tell us. And then there's this thing about we're going to stay here until you tell us. And then there's what they actually did, which was staying there until they tell us, which was how they actually behaved. Some part of the record shows that he was in tears also. I don't recall specifically a portion where he's in tears. I know as he got close to admitting he was present, he got very quiet and his voice got very soft. I don't recall any crying. I listened to the tapes. They're quite lengthy. I don't recall any crying. I do record, recollect some periods where he speaks very softly. What about the fact, what do we do with the fact that he confessed to something that we know isn't true? That's not accurate. And what happens is the first eight hours, pretty much, he implicates himself as far as he can. And he really doesn't implicate himself very much. It's largely self-exculpatory statement. He claims, we went there to test the exterior security system. That was the whole plan. We successfully got to the temple and I simply followed these guys in and they did the killing and I had nothing to do with it. After that, the last five hours are spent with him describing whom he claimed were friends of this George Gonzalez, who he claimed was there, and the police are trying to identify those friends as the Tucson Four, and he says initially, they're not, you got the wrong guys. Those are not the ones involved. There are no black, I guess they were black guys that were from the Tucson Four. You got the wrong guys. They keep asking him, you know, give a description. He gives very vague descriptions. The closest he ever, he never implicates the Tucson Four. The closest he ever comes is to say, well, I don't know where these guys are from. I suppose they're from Tucson. I didn't really get a good look at them. They show him a couple of photographs of the Tucson Four and he looks at them and says, well, it's possible these could be a couple of the guys. I never really got a good look at them. I couldn't tell if they were Hispanic or black. So he never actually implicates the Tucson Four. But as it turns out, there are no other four, or at least that's the State's position. Right. The Tucson Four had confessed. Any four. Not those four. There's no other four. They're certainly not. The only two that did this was Garcia and Duty. Those are the only two involved. So he's still confessing to something that isn't so. He's lying through his teeth. And that, I think, shows it is voluntary because he never came close to telling the truth. He lies through his teeth all the way through the interview. Oh, actually, I mean, as it turns out, he was not, he was convicted of felony murder, right, and not of intentional murder? Right, correct. So the jury apparently found that he wasn't the gunman. No. They found a lack of, well, we don't know what they found. They didn't find beyond a reasonable doubt that the killings were, quote, unquote, premeditated. Well, but that would be pretty difficult for whoever it was, was the shooter. Well, I think we're speculating. I mean, premeditation, I think clearly, even under Garcia's testimony at trial, there's some issue whether they were going to execute all of them. I think he said that initially they weren't going to, but then that duty decided to leave no witnesses. And you really can't read into the jurors not returning a verdict on premeditated what they found. Clearly, the evidence of felony murder was overwhelming. And, again, I think the murder. Or they could have believed some portion of his story, that he wasn't the shooter. Well, and if they did, that could have only benefited him because, like I said. No, but it's just as relevant to how much he was lying. Right, right. He's clearly lying in his so-called confession. I wouldn't call it a confession because it's certainly not the truth. And the Court of Appeals, as I noted carefully, considers the length of the interview or interrogation as well as all other relevant circumstances. And I've set them forth in my brief, I think pages 46 to 56. I'm not going to rehash all those. And I think we've covered pretty much the length of the interrogation, which, as the Court of Appeals said, is the most troubling aspect of this case. It was a rather lengthy interrogation. And the badgering and the repetition and the statements, which whether we call them demorandizing or factor them into the voluntariness statement, did seem to tell him that whatever they had told him before, he really had to stay there and answer their questions. I don't agree that that was what was conveyed. Certainly, there were some interrogation tactics used. Most of it was, you know, being nice to him, appealing to his sense of honor and duty, those kind of things. But, you know, not enough to overcome a free will. There are many cases. One that comes to mind is, I believe it's this Court's opinion in United States v. Miller, where an FBI agent appeals to the suspect's Mormon beliefs. Another one is Amaya Ruiz v. Stewart, a case out of Arizona, where the police clearly a lot more than this case appeal. Is there a case which has these two features, a 13-hour interrogation and a minor? I believe ñ I know the district court cited two cases where the interrogation went on for, I think, once, 26 hours, but I don't know that. I can't say that was a minor. And there was another one the district court cited where there were three days of repeatedly interrogated. Again, I don't know that that was a minor. But I would point out the court of appeals gave careful care to the fact that he was a juvenile. And, again, we're talking about a 17-and-a-half-year-old emancipated minor who ñ But then they say things like he's mature, he's intelligent. Why is he intelligent? Because he wants to be a pilot. That doesn't follow. I mean, there are retarded people who want to be pilots. It doesn't ñ it's realistic. But I think what shows he was intelligent is the fact that he was not only in the ROTC, he was the commander of both the Honor Guard and the Color Guard, and he had also been active in the Civil Air Patrol. This was an extremely intelligent, self-disciplined, self-confident young man. And, quite frankly, this is an aberration. Until the day of these murders, he was a good citizen. And we can only speculate what made him do what he did. But, clearly, everything that the police officers knew when they interviewed him shows that he was ñ he may have been chronologically a juvenile, but he was awfully close to being an adult. And I think the Court of Appeals carefully considered the totality of the circumstances and their conclusion that, despite the length of the interview and some of the other idiosyncrasies mentioned, his free will was not overborne. And, quite frankly, under the ADPA, that's not an unreasonable ñ Let me just clarify something. At the time of the murders, he was living with his family. No ñ oh, the murders, yes, Your Honor, yes, yes. It was afterwards when they moved to Colorado that he then started living with ñ so at the time of the murders, you say he was an emancipated minor. He really wasn't at that point. Well, I think we have to look at the time of the interrogation because that's obviously the relevant portion. And his parents moved out sometime in August. He had an apartment with another young man. He had an apartment with two friends of his. And then he moved in with his ñ who would wind up being his co-defendant, Garcia, and his family. So he, you know, he was an emancipated minor for all intents and purposes. Are you going to touch on your argument that this was harmless error in any event? I think it clearly was. I didn't want to ñ because that's a very fact-bound issue. I think I've set it forth in the brief. And the reason I really stress that is because he essentially confessed to three acquaintances and friends, and that ñ what he told those people are far closer to the truth than what he told the police in this situation, that he simply followed these people in and stood there, went outside, and the killing started, came in, and just merely helped them collect the items after the fact because he was afraid. He told his girlfriend that he and Garcia had killed the monks because they were threatening national security. He told, I think, Brandon Berner that he and Garcia had killed the monks. He told another friend, Ben Leninger, who was a member of the ROTC, that they killed the monks and that they got $2,000. They all seemed to think this was a joke or didn't believe him or ñ Well, you know, I'm not sure on that, Your Honor. They probably didn't believe that this young man who, until that time, was a law-abiding, honest citizen, they probably thought he was joking. But as it turned out, he obviously was not, and they all testified at trial. And those statements are far more damning than his so-called confession. And I also, you know, would note that the Brecht standard, the substantial injurious effect on the verdict is less to meet than the beyond a reasonable doubt. I didn't want to argue that factual matter before the Court today, but I strongly believe that this clearly would not meet the ñ would meet the Brecht standard, however you want to look at it. Okay. Unless the Court has any further questions, I would ask that the Court affirm the district court judgment denying the red. Thank you very much for your useful argument. Just a few points. I must respond to my adversary's suggestion that Jonathan was lying through his teeth. What Jonathan was doing was trying to satisfy these interrogators and put an end to this interrogation. He was trying to get them to stop. He's telling the interrogators what they want to hear. And one of the things that's wrong with that and one of the things that's wrong with using this kind of interrogation and these kinds of confessions as evidence in criminal cases is you don't get good evidence from them. You don't get reliable, trustworthy ñ I'm sorry? What about the fact that he subsequently confessed to other people that he had committed the killing? I think Judge Fletcher has that one right. This was teenage boasting. Was it subsequent or before? Well, I think that the statements were subsequent. There was a prior statement, I believe, about talking about ñ and an open statement about going up to the temple and some kind of ñ to see if they could evade the security, which he wasn't secretive about at all. But the other statements, which nobody believed and which were taken as jokes, were just teenage ñ That's what I don't understand. Were they before or after the confession? It was before. They were before the confession. They were before the confession. I'm sorry. They were before the confession. In terms of the care with which the court of appeals dealt with these issues, I take issue there, too, because the Arizona court of appeals ñ first of all, the trial court says, this is really a close question on the voluntariness of the confession, and I'm confident that the court of appeals is going to take a careful look at this. And that's what the Supreme Court precedent requires, really careful, close scrutiny of these juvenile confessions. But then what the court of appeals does, and it does right at length, but what it also does is say, abuse of discretion, we're not going to reverse for clear ñ except for clear error, and in any event, the jury gets to consider whether the statement is voluntary or not. And it's kind of a washing of their hands in the whole thing and a passing of the buck, which I don't think comports with constitutional standards either. I take issue also with my adversary's description of Jonathan as a self-confident young man. He was anything but. He was ñ and that's ñ the psychologist's report, again, speaks to that issue. Summary statement is, psychological test data demonstrate that Jonathan is an individual who does have a number of issues of anxiety, low self-esteem, insecurity, and a pattern of being emotionally quite timid and unsure of himself. This description of timid is used very often. And Jonathan's way of getting along in a situation, as the psychologist's reports indicate, is to kind of try to fit in. Yeah, he's in his honor guard uniform. And the officers interrogating him are appealing to his sense of duty and honor. And Captain White comes in and he, you know, he kind of comes to attention. But that doesn't mean that he was alert and responsive throughout the interrogation. And that's another factual error that the Arizona State courts made. One last point. In terms of his being close to being an adult, he was almost 17 1⁄2, but I would like to suggest that that makes him particularly vulnerable in these circumstances, because young men of that age, boys of that age, think they're invulnerable. And I think that makes them particularly vulnerable. And I think that the Supreme Court has recognized that as well. In terms of other Supreme Court cases with such a lengthy interrogation of a minor, one doesn't come to mind, but I suggest that you look at the old Spano case, Spano v. New York, where it was an adult who was interrogated at length, an adult who came from another culture, another country. And the Supreme Court said that was no good. On the harmless error question, this is a very belated claim by the State. They never in the State court proceedings suggested that this could be harmless error. And I don't see how they could have. They relied on this confession in both the opening statement and the closing statement. They played the entire interrogation tapes for the jury, and the suggestion that it was harmless error should, I think, be rejected. Thank you very much. I thank both counsel for a useful argument in a difficult case. The case of Duty v. Schreiro is submitted. And we will go to the last argued case of the day, Fernando v. McCasey. Fernandez v. McCasey.
judges: Fletcher, Berzon, Rawlinson